# EXHIBIT H

```
                                                            Page 1

 1              IN THE UNITED STATES DISTRICT COURT
                       DISTRICT OF KANSAS
 2
      JEFFREY GARRELS,            )
 3                                )
              Plaintiff,          )
 4                                )
      v.                          ) Case No. 23-CV-01078-TC-GEB
 5                                )
      UNION PACIFIC RAILROAD      )
 6    COMPANY,                    )
      a Delaware Corporation,     )
 7                                )
         Defendant/               )
 8       Third-Party Plaintiff,)
                                  )
 9    v.                          )
                                  )
10    C&W Facility Services,      )
      Inc.,                       )
11                                )
         Third-Party Defendant/)
12       Additional Third-Party)
         Party,                   )
13                                )
         v.                       )
14                                )
      VERICLEAN SERVICES          )
15    CORPORATION,                )
                                  )
16       Additional Third-Party)
         Defendant.               )
17
18
19         VIRTUAL ZOOM DEPOSITION OF WENDY GARRELS
20
                      Taken on Behalf of
21                 Third-Party Defendant
                Vericlean Services Corporation
22
                      September 26, 2024
23
         (The deposition began at Central Time, U.S.)
24
25
```

Veritext Legal Solutions

www.veritext.com                                 888-391-3376

Page 90

1  make sure I'm clear. He had already been treated at
2  the emergency room, and then you picked him up after
3  his treatment. Is that fair to say?
4     A. Yes, I sat with him. I think when I got
5  there, they had already done the X-rays or whatever
6  else. That was already done and taken care of. I sat
7  with him when the -- when they come back in and
8  dismissed him.
9     Q. Okay. In other words, whatever treatment or
10 evaluation they had already done, they had done that
11 and then you kind of show up at the tail end when
12 they're getting ready to dismiss him?
13    A. Correct.
14    Q. Fair to say you didn't hear all the
15 conversation that Mr. Garrels had with the emergency
16 room doctors; is that fair?
17    A. Yes, that's fair.
18    Q. You wouldn't have been present for all of
19 it; is that correct?
20    A. That is correct.
21    Q. All right. Now, I'm going to show you
22 Exhibit 3 here. And if I'm understanding correctly,
23 when he went to the emergency room, would it have been
24 in Mary -- Marysville, Kansas, at a Community Memorial
25 Healthcare facility?

Page 91

1        [Marked Wendy Garrels Exhibit No. 3.]
2     A. That's correct.
3     Q. All right. Tell me when you can see Exhibit
4  3 on your -- on your screen. Do you see this?
5     A. Yes.
6     Q. We've got a couple of highlights here on
7  Exhibit 3. It says that he came in "complaining of
8  hip pain." Do you see that?
9     A. Yes.
10    Q. It also says here "He denied any other
11 injuries." Do you see that?
12    A. Yes.
13    Q. And said -- it says, he says, "He did not
14 hit his head, back, neck, or back." Do you see that?
15    A. Yes.
16        MR. JONES: And then I'm going to -- hey,
17 Trent, I'm going to object real quick to the lack of
18 foundation for her on this document. Okay.
19        MR. CHURCH: All right.
20        MR. JONES: And also that these questions
21 call for speculation. You've already established she
22 wasn't there.
23        MR. CHURCH: Yeah. I'm just asking. I'm --
24 I'm using this to lead up to my question. I
25 understand she wasn't there.

Page 92

1        MR. JONES: Okay.
2        MR. CHURCH: And I understand she's not the
3  doctor or whatever.
4     Q. (By Mr. Church) But here's my question. I
5  want you to just see if you can read this, and then
6  I'll ask my question. It says here, he says, "He has
7  chronic back pain, but he's not having any back pain
8  here at all in the ER. He did not hurt his back
9  during the fall per his report." Do you see that,
10 ma'am?
11    A. Yes.
12    Q. Do you have any reason to disagree that your
13 husband told the doctor that he didn't hurt his back
14 in the accident?
15        MR. JONES: Objection, lack of foundation,
16 calls for speculation. She has not seen the medical
17 records. She wasn't there for the conversation.
18 She's already testified to that. The question is
19 improper. But if you somehow know the answer, you can
20 try to answer.
21        MR. CHURCH: Yeah, let's not do speaking
22 objections, please. You can -- you know what the
23 rules are. It's form. You can say foundation if you
24 want, but you don't -- we don't tell her things.
25    Q. (By Mr. Church) So I'm just asking you,

Page 93

1  Ms. Garrels, do you have any reason to disagree that
2  your husband told the ER doctor that he did not hurt
3  his back in the incident?
4        MR. JONES: Lack of foundation. It calls
5  for speculation. Subject to that, if you can answer,
6  go ahead.
7     A. I cannot answer that. I wasn't there.
8     Q. (By Mr. Church) Right. And so you wouldn't
9  have a reason to disagree if the doctor said, "That's
10 what he told me," right?
11        MR. JONES: Object. The same objections.
12    A. Correct.
13    Q. (By Mr. Church) Now, you talked a little bit
14 about how Mr. Garrels had told you over the years,
15 man, my lower back hurts when I ride trains. Do you
16 remember talking about that with Mr. Hobbs?
17    A. Yes.
18        MR. JONES: Objection, foundation, misstates
19 former testimony.
20    Q. (By Mr. Church) Do you recall that?
21    A. Yes.
22    Q. Okay. And so that was something that he had
23 told you multiple times throughout his railroad career
24 prior to the accident, that his lower back hurt when
25 he would ride trains; is that fair?

24 (Pages 90 - 93)

Page 94

1    MS. JONES: Objection, misstates the
2 testimony, lack of foundation.
3    Q. (By Mr. Church) Go ahead.
4    A. Yeah, he mentioned it a time or two.
5    Q. Okay. I'm going to show you Exhibit 4 here.
6 I think you mentioned your husband would sometimes go
7 to see a doctor. Was it like a Dr. Hanquist. Does
8 that sound like a correct statement?
9       [Marked Wendy Garrels Exhibit No. 4.]
10    A. I don't remember a Hanquist.
11    Q. Okay. Well, take a look at Exhibit 4 here.
12 I've got some highlighted language here on it. Can
13 you see this document, ma'am?
14    A. Yes.
15    Q. And you can see the date on this? Zoom in.
16 June 6, 2019.
17    A. Okay.
18       MR. JONES: Trent, do you mind if we have a
19 standing objection to your use of these medical
20 records, as she's never seen and is unfamiliar with?
21       MR. CHURCH: Sure. I'll give you a standing
22 objection to everything you want to object to. In
23 fact, I preserve all of it. So that way you don't
24 have to say anything, and we can move on. Is that
25 cool?

Page 95

1       MS. JONES: It's fine with me.
2       MR. CHURCH: Sounds good.
3       MR. JONES: The only thing that I am going
4 to clarify for the witness is, Wendy, I don't want you
5 to speculate or guess at things that you don't know.
6       THE WITNESS: Okay.
7       MR. CHURCH: That's fine.
8    Q. (By Mr. Church) Here's what I'm getting at.
9 If you -- and I know you're not a doctor, but you
10 would agree with me, June 6, 2019 is what is mentioned
11 on this record that I put in front of you as Exhibit
12 4, Ms. Garrels?
13    A. Okay.
14    Q. That -- that's a date that occurred before
15 the July 2021 incident, right?
16    A. Yes.
17    Q. Okay. And one of the things it mentioned
18 here is he's had some "lumbar back pain, intermittent
19 symptoms of left sciatica," and it says, he's had
20 intermittent problems with this ongoing all the way
21 back to January 2016. Do you see that?
22    A. Yes, I see it.
23    Q. Does that seem consistent with what you
24 discussed with your husband, that he had had problems
25 with his low back and pain that would occur when he'd

Page 96

1 ride trains all the way back to January of 2016?
2    A. Yes.
3       MR. JONES: Trent, for completeness, can you
4 read the line that followed where you stopped reading?
5       MR. CHURCH: I mean, you can cross-examine
6 her any time you want, Jon. I'm in the middle of my
7 examination. And so I'm just asking some questions,
8 sir. If you want me to pull this back up after, I
9 will.
10       MR. JONES: Okay.
11    Q. (By Mr. Church) Here's what I'm getting --
12 here's what I'm getting at. Now, the next piece that
13 says, "He works as a train conductor and reports that
14 riding in the train is very rough and causes his back
15 to be very tense." Do you see that?
16    A. Yes.
17    Q. Here's what I'm getting at. Ms. Garrels,
18 would you agree with me that Mr. Garrels knew, at
19 least as of June 2019 and before, that his low back
20 injury or condition was caused by his work?
21    A. I believe so.
22    Q. Okay. So he knew that it was coming from
23 his work since June of 2019, and -- and, frankly,
24 before that, January of 2016. Would you agree with
25 that?

Page 97

1    A. Yes.
2    Q. Okay. And specifically, he told you during
3 that time frame that it was coming from when he was
4 riding trains. Would you agree with that?
5    A. Yes.
6    Q. As far as his employment at Union Pacific?
7    A. Yes.
8    Q. All right. Now, I think I had heard this
9 correctly, but help me out here. So Mr. Garrels --
10 I've seen some records, and if this jives with your
11 memory, let me know. Mr. Garrels, I know, sometime in
12 2022 had gone into the hospital with COVID, and they
13 said he had what was called a pulmonary embolism. Do
14 you -- do you recall something like that?
15    A. Yes.
16    Q. Okay. Between the end of 2022 up to when he
17 gets -- goes into the hospital in 2024 before his
18 death, did he have -- did he have people he treated
19 with for the heart or for his breathing conditions
20 during that time frame, or was it like --
21    A. Yes.
22    Q. Go ahead.
23    A. Yes.
24    Q. Who would he have been treating with?
25    A. Dr. Meier, the heart doctor.